UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

**RICKY LANGLEY**         :         **DOCKET NO. 13-cv-2780**
    **D.O.C. # 182954**

**VERSUS**         :         **JUDGE TRIMBLE**

**HOWARD PRINCE**         :         **MAGISTRATE JUDGE KAY**

**REPORT AND RECOMMENDATION**

Before the court is an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, filed by Ricky Langley ("Langley") [doc. 1]. Langley is a prisoner in the custody of the Louisiana Department of Public Safety and Corrections and is currently incarcerated at the Elayn Hunt Correctional Center. Howard Prince, warden of the Elayn Hunt Correctional Center, has responded [doc. 10].

This matter is referred to the undersigned for review, report, and recommendation in accordance with 28 U.S.C. § 636 and the standing orders of the court. For the following reasons **IT IS RECOMMEDED** that the application be **DENIED** and that the petition be **DISMISSED WITH PREJUDICE**.

**I.**
**BACKGROUND**

   *A. Conviction and Direct Appeal*

     *1. First Trial*

On July 9, 1994, Langley was convicted by a jury sitting in the 19th Judicial District, Baton Rouge, Louisiana, of first degree murder for the killing of six-year-old Jeremy Guillory

("Guillory") and subsequently sentenced to death.[1] *State v. Langley*, 711 So.2d 651, 656 (La. 1998). However, pursuant to a United States Supreme Court holding in *Campbell v. Louisiana*, 118 S.Ct. 1419 (1998), the Louisiana Supreme Court later quashed the indictment against Langley based on a finding of discrimination in the selection of the grand jury foreperson. *State v. Langley*, 813 So.2d 356, 358 (La. 2002).

   *2. Second Trial*

Langley was reindicted in the 14th Judicial District, Calcasieu Parish, on a charge of first degree murder and retried there by a jury selected from Orleans Parish. *State v. Langley*, 958 So.2d 1160, 1162 (La. 2007). The approved jury instructions related to Langley's insanity plea provided:

> Insanity at the time of the commission of a crime exempts the offender from criminal responsibility. If the circumstances indicate that because of mental disease or mental defect the defendant was incapable of distinguishing between right and wrong with reference to the conduct in question, the defendant must be found not guilty by reason of insanity.

Doc. 15, att. 15, p. 199. Meanwhile, the approved jury instructions related to first and second degree murder read as follows:

> First degree murder is the killing of a human being when the offender acted with a specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of a second degree kidnapping or the victim is under the age of twelve.
> Specific criminal intent is the state of mind which exists when the circumstances indicate that a defendant actively desired the prescribed criminal consequences to follow his act or failure to act
> . . . .
> Whether criminal intent is present must be determined in light of ordinary experience. Intent is a question of fact which may be inferred from the circumstances.
> You may infer that the defendant intended the natural and probable consequences of his acts.
> . . . .

---

[1] The murder took place in Calcasieu Parish. *Id.* at 656–57. Langley was indicted there in the 14th Judicial District but the Louisiana Supreme Court ordered that venue be transferred to the 19th Judicial District due to pre-trial publicity. *Id.* at 657. The Louisiana Supreme Court originally affirmed the conviction and sentence on direct appeal. *Id.* at 656.

> If you are not convinced that a defendant is guilty of an offense charged, you may find a defendant guilty of a lesser offense, if you are convinced beyond a reasonable doubt that the defendant is guilty of a lesser offense.
> The responsive lesser offenses to the charge of first degree murder are second degree murder and manslaughter.
> Second degree murder is the killing of a human being when the offender caused the death of the human being with specific intent to kill or inflict great bodily harm; *or* the killing of a human being while the defendant was engaged in the perpetration or attempted perpetration of cruelty to juveniles, or second degree kidnapping, even though he had no intent to kill or inflict great bodily harm.

*Id.* at 195–97.[2]

At trial the prosecution produced multiple witnesses involved in the investigation. Former FBI agent Don Dixon ("Dixon") testified that Langley confessed to him that he had followed Guillory upstairs and choked him to death when Guillory had visited the house where Langley was staying to play with the two children who lived there. Doc. 17, att. 10, pp. 56–57. Dixon related how Langley then gave Dixon and other law enforcement officers a videotaped tour of the house. *Id.* at 58–65.

This tape was played at trial, wherein Langley again confessed to choking Guillory and then laying him on his bed. *Id.* at 65–66; Doc. 26, att. 1, 9:20–10:56. Langley then related how he later heard noises coming from the body of Guillory and proceeded to strangle the boy with a trout line before stuffing a sock into his mouth. *Id.* at 11:36–13:04. Finally, he showed where he had hidden Guillory's corpse in a closet. *Id.* at 17:30–25:02.

Video of a second interview, conducted that evening, was then played for the jury. Doc. 17, att. 10, pp. 72–74. Here Langley described a mounting sexual attraction to Guillory over the

---

[2] At trial the judge defined second degree murder as killing "with or without specific intent to kill or inflict great bodily harm." Doc. 17, att. 18, p. 64. After the jury was removed, one of the prosecutors objected. *Id.* at 89–90. The definitions were amended to reflect those quoted above, showing that second degree murder was defined as either murder committed with specific intent to kill or without specific intent to kill during the perpetration of one of the enumerated offenses. *Id.* at 92.

past several days, having previously encountered him playing with the two children who lived in the house where Langley rented a room. Doc. 26, att. 2, 7:15–13:20. He gave the same account of killing Guillory by first choking him and then strangling him and placing the sock in his mouth. *Id.* at 20:05–22:59, 29:17–32:56. However, this time he also confessed to molesting the boy after choking him. *Id.* at 28:45–29:17.

Video of another interview, conducted several weeks after Langley's arrest, was also played at trial. Doc. 17, att. 12, pp. 27–29, 32. Langley again told of strangling the boy and then stuffing a sock in his mouth after the choking. Doc. 26, att. 3, 9:30–11:13. This time, however, he admitted that he had beckoned Guillory into the house upon realizing that he "was alone and could do what [he] wanted." *Id.* at 3:30–4:54. He also confessed to molesting Guillory before choking him rather than after. *Id.* at 4:54–8:45.

Finally the prosecution put on testimony from the former assistant coroner for Calcasieu Parish, Dr. Lehrue Stevens ("Stevens"). Doc. 17, att. 11, pp. 106–07. Stevens had performed the autopsy on Guillory. *Id.* at 107. He testified that a piece of string that had been wrapped around Guillory's neck at least twice and that an athletic sock filled the boy's mouth and the first portion of his throat. *Id.* at 109–11. Stevens also testified to other signs discovered during the autopsy indicating that the cause of death was asphyxiation by strangulation. *Id.* at 113–15. Leanne Suchanek, forensic serologist at the Southwest Louisiana Crime Lab, testified that she had examined the t-shirt worn by the victim at the time he was killed and found that it contained seminal stains, which she prepared for DNA comparison with Langley's blood sample. *Id.* at 148, 154–61. Dr. Frank Baechtel, a forensic examiner from the FBI, testified that the blood sample and semen stain were received by the FBI's DNA analysis unit and that testing revealed to a virtual

certainty that Langley was the source of the semen. Doc. 17, att. 12, pp. 88–104; Doc. 17, att. 13, pp. 42–45.

At opening argument the defense introduced its theory of the case: that Langley could not have formed the specific intent to kill Guillory because mental illness kept him from distinguishing right from wrong.[3] Doc. 17, att. 8, p. 83. The defense's witnesses in support of this theory included a friend of Langley's, who testified that Langley had previously sought help for a nervous breakdown relating to his pedophilia on one occasion in 1984 or 1985 but had been turned away at the mental health clinic after a brief visit with a doctor there. Doc. 17, att. 13, pp. 73–77. The defense also called Darlene Langley and Francis Langley Prejean, sisters of Langley. *Id.* at 80; Doc. 17, att. 15, pp. 136–37. Darlene Langley described their family history, including a traumatic car accident preceding the Langley's birth and its impact on their mother's health, and Langley's obsession with the brother who had died in that accident. Doc. 17, att. 13, pp. 80–102. Francis Langley Prejean also testified on the car accident and Langley's history of being bullied in school. Doc. 17, att. 15, pp. 136–45.

The defense called Drs. Beverly Howze and Rahn Bailey as experts in the field of clinical psychology and psychiatry, respectively, to testify on Langley's mental health issues. Doc. 17, att. 13, pp. 126–188; Doc. 17, att. 14, pp. 1–21 (Howze); *Id.* at 32–96; Doc. 17, att. 15, pp. 42–86 (Bailey). It also introduced Dr. Robert Maupin, an expert in the field of maternal and fetal medicine, who testified on the brain damage Langley could have suffered as a result of his prenatal exposure to drugs, alcohol, and X-rays. *Id.* at 86–127. The prosecution then put on its own expert

---

[3] "And what we will show you during this trial is that Ricky Langley did not, could not intend to kill Jeremy Guillory . . . . because Ricky Langley is mentally ill and he has been that way since early in his adolescence. And because of that mental illness Ricky could not distinguish right from wrong at the time Jeremy died and was literally incapable of intending Jeremy's death on that day." Doc. 17, att. 8, p. 83.

witnesses in psychiatry and psychology, Drs. Dennis Kelly and Aretta Rathmelle. *Id.* at 177–223; Doc. 17, att. 16, pp. 1–25 (Kelly); *Id.* at 25–68; Doc. 17, att. 17, pp. 42–72 (Rathmelle).

On May 16, 2003, the jury returned a unanimous verdict finding Langley guilty of the lesser included offense of second degree murder. Doc. 17, att. 19, pp. 49–50. However, the Louisiana Third Circuit Court of Appeal reversed the conviction due to the trial judge's absences from the courtroom and his failure to maintain decorum during the trial. *State v. Langley*, 896 So.2d 200, 209–10 (La. Ct. App. 3d Cir. 2004). After the Third Circuit's ruling, the state reindicted Langley for first degree murder. *Langley*, 958 So.2d at 1163. Langley moved to quash the indictment and the Louisiana Supreme Court ruled that the second jury's rejection of first degree murder during this trial meant that Langley could not be recharged with it during subsequent proceedings. *Id.* at 1169–70.

### 3. *Third Trial*

The indictment was amended to a charge of second degree murder and Langley received a bench trial in the 14th Judicial District before the Honorable Robert L. Wyatt. *State v. Langley*, 61 So.3d 747, 754 (La. Ct. App. 3d Cir. 2011). On November 6, 2009, Langley was convicted of second degree murder for the death of Guillory. Doc. 20, att. 7, pp. 83, 190–94. Announcing the verdict, Judge Wyatt said:

> That Jeremy Guillory died at the hands of Ricky Langley is something that has been proved basically beyond all doubt. The issue of specific intent . . . is necessary for the determination of guilt as to second degree murder. This Court has heard among all the myriad of evidence that has been presented through live testimony and the testimony of parties that have not been able to appear . . . how Ricky Langley described how he had seen Jeremy Guillory, wanted him, was tempted to deal with him because of his pedophilia which we came to find out. And how I believe that he recognized that because of his past indiscretions with children that if he was to have a sexual encounter with this young man that, I believe, he recognized that he could not let this young man live.

> Add to that statements attributed to Ricky Langley that in his own feeble reckoning he could not let this young boy continue to live because of his own demons, and he was going to relieve him of those and do this little boy a favor.
>
> So whether or not there was specific intent to kill Jeremy Guillory, this court finds that there was.

*Id.* at 191–92.

Langley filed a timely appeal of this verdict with the Louisiana Third Circuit Court of Appeal, citing several assignments of error. *Langley*, 61 So.3d at 755–56. First among these was the charge that retrying Langley for second degree murder (specific intent) violated the Constitution's prohibition against double jeopardy. *Id.* at 755. The Third Circuit reviewed this contention on the merits and rejected it. *Id.* at 756–58. The Louisiana Supreme Court denied discretionary review of Langley's appeal on January 20, 2012. *State v. Langley*, 78 So.3d 139 (La. 2012). He then sought review from the United States Supreme Court, which denied his petition for a writ of certiorari on October 1, 2012. *Langley v. Louisiana*, 133 S.Ct. 148 (2012).

### B. Habeas Application

Langley did not seek collateral review at the state level. Doc. 1, p. 3. Instead he filed the instant petition on September 30, 2013. Doc. 1. As his sole assignment of error he renews the double jeopardy claim from his direct appeal. *Id.* at 2–3.

## II.
### LEGAL STANDARDS ON HABEAS REVIEW

### A. Timeliness

Federal law imposes a one-year limitation period within which persons who are in custody pursuant to the judgment of a state court may seek habeas review in federal court. 28 U.S.C. § 2244(d)(1). This limitation period generally runs from the date that the conviction becomes final. *See* 28 U.S.C. § 2244(d)(1)(A). The time during which a properly-filed application for post-

conviction relief is pending in state court is not counted toward the one-year limit. 28 U.S.C. § 2244(d)(2); *Ott v. Johnson*, 192 F.3d 510, 512 (5th Cir. 1999). However, any lapse of time before proper filing in state court *is* counted. *Flanagan v. Johnson*, 154 F.3d 196, 199 n.1 (5th Cir. 1998).

A state application is considered pending both while it is in state court for review and also during intervals between a state court's disposition and the petitioner's timely filing for review at the next level of state consideration. *Melancon v. Kaylo*, 259 F.3d 401, 406 (5th Cir. 2001). The limitations period is not tolled, however, for the period between the completion of state review and the filing of the federal habeas application. *Mayle v. Felix*, 545 U.S. 644, 644 (2005). Accordingly, in order to determine whether a habeas petition is time-barred under the provisions of §2244(d) the court must ascertain: (1) the date upon which the judgment became final either by the conclusion of direct review or by the expiration of time for seeking further direct review, (2) the dates during which properly filed petitions for post-conviction or other collateral review were pending in the state courts, and (3) the date upon which the petitioner filed his federal habeas corpus petition.

### B. *Exhaustion of State Court Remedies and Procedural Default*

Before we proceed to a consideration of the merits of the issues raised in the petition, we must also consider the doctrines of procedural default and exhaustion of state court remedies.

#### 1. *Exhaustion of State Court Remedies*

A petitioner seeking federal habeas corpus relief must exhaust all available state court remedies prior to filing his federal petition. 28 U.S.C. § 2254(b)(1); *e.g.*, *Whitehead v. Johnson,* 157 F.3d 384, 387 (5th Cir. 1998). This is a matter of comity. *Ex parte Royall*, 6 S.Ct. 734 (1886). In order to satisfy the exhaustion requirement, the petitioner must have "fairly presented" the substance of his federal constitutional claims to the state courts in a "procedurally

proper manner." *Wilder v. Cockrell,* 274 F.3d 255, 259 (5th Cir. 2001); *Dupuy v. Butler*, 837 F.2d 699, 702 (5th Cir. 1988). Each claim must be presented to the state's highest court, even when review by that court is discretionary. *Castille v. Peoples*, 109 S.Ct. 1056 (1989). In Louisiana the highest court is the Louisiana Supreme Court. *See* LSA–Const. art. 5, § 5(a) ("The supreme court has general supervisory jurisdiction over all other courts . . . .")

Thus, in order for a Louisiana prisoner to have exhausted his state court remedies, he must have fairly presented the substance of his federal constitutional claims to the Louisiana Supreme Court in a procedurally correct manner. *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997). Exhaustion requires that any federal constitutional claim presented to the state courts be supported by the same factual allegations and legal theories upon which the petitioner bases his federal claims. *Picard v. Connor*, 404 U.S. 270, 276 (1971).

### 2. *Procedural Default*

When a prisoner has defaulted a claim by violating a state procedural rule which constitutes adequate and independent grounds to bar direct review in the United States Supreme Court, the prisoner may not raise that claim in a federal habeas proceeding absent a showing of cause and prejudice or actual innocence. *Coleman v. Thompson*, 111 S.Ct. 2546, 2554 (1991). Failure to satisfy state procedural requirements results in a forfeiture of a prisoner's right to present a claim in a federal habeas proceeding. *Murray v. Carrier*, 106 S.Ct. 2639 (1986). This is not a jurisdictional matter but rather is grounded in concerns of comity and federalism. *Trest v. Cain*, 118 S.Ct. 478 (1997).

Procedural default exists where (1) a state court clearly and expressly bases its dismissal of the petitioner's constitutional claim on a state procedural rule and that procedural rule provides an independent and adequate ground for the dismissal ("traditional" procedural default) or (2) the

petitioner fails to properly exhaust all available state court remedies and the state court to which he would be required to petition would now find the claims procedurally barred ("technical" procedural default). In either instance, the petitioner is deemed to have forfeited his federal habeas claims. *Bledsue v. Johnson*, 188 F.3d 250, 254–5 (5th Cir. 1999). The grounds for procedural default must be based on the actions of the last state court rendering a judgment. *Harris v. Reed*, 109 S.Ct. 1038, 1043 (1989).

A federal habeas petitioner may be excluded from the procedural default rule only if he can show "cause" for his default and "prejudice attributed thereto," or demonstrate that the federal court's failure to review the claim will result in a "fundamental miscarriage of justice." *Fisher v. Texas*, 169 F.3d 295, 301 (5th Cir. 1999); *Amos v. Scott*, 61 F.3d 333, 338–39 (5th Cir. 1995). To establish cause, a petitioner must demonstrate that some factor outside of the defense impaired his efforts to comply with the state procedural rule. *Murray v. Carrier*, 106 S.Ct. 2639, 2645 (1986). To show a fundamental miscarriage of justice, the petitioner must provide the court with evidence that would support a "colorable showing" of actual innocence. *Kuhlmann v. Wilson*, 106 S.Ct. 2616, 2627 (1986).

### C. General Principles

Federal courts of the United States have jurisdiction over writs of habeas corpus on behalf of a person in state custody only if that person "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

When a state district court adjudicates a petitioner's claim on the merits, this court reviews the state court adjudication under the deferential standard of 28 U.S.C. § 2254(d). *Corwin v. Johnson*, 150 F.3d 456, 471 (5th Cir. 1998). Section 2254(d) provides that a writ of habeas corpus shall not be granted unless the state court's adjudication on the merits resulted in a decision that

was either (1) contrary to clearly established federal law or involved an unreasonable application of that law, or (2) based on an unreasonable determination of the facts in light of the evidence before the state court. 28 U.S.C. § 2254(d).

The first standard, whether the state court's adjudication was contrary to or involved an unreasonable application of clearly established federal law, applies to questions of law as well as mixed questions of law and fact. A petitioner must demonstrate that the "fair import" of the state court decision shows that the court failed to apply the controlling federal standard. *Early v. Packer*, 537 U.S. 3, 9 (2002) (per curiam). Furthermore, the decision must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington v. Richter*, 131 S.Ct. 770, 784 (2011). A decision is contrary to clearly established federal law "if the state court applies a rule that contradicts the governing law set forth [by the Supreme Court], or if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedents and arrives at a [contrary] result . . . ." *Bell v. Cone*, 543 U.S. 447, 452-53 (2005), quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (internal quotations omitted). In order for a state court's application of federal law to be unreasonable, the application must be more than simply erroneous but rather so incorrect as to be objectively unreasonable. *Dilosa v. Cain*, 279 F.2d 259, 262 (5th Cir. 2002).

The second standard – whether the state court's adjudication was based on an unreasonable determination of the facts in light of the evidence – applies to questions of fact. It is insufficient for a petitioner to show that the state court erred in its factual determination but rather he must demonstrate that the factual determination was objectively unreasonable, a "substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different

conclusion in the first instance." *Wood v. Allen*, 130 S.Ct. 841, 849 (2010). Rather, the petitioner has to show that "a reasonable factfinder must conclude" that the determination of facts by the state court was unreasonable. *Rice v. Collins*, 546 U.S. 333, 341 (2006).

The deferential standards of review elucidated above are applicable on habeas review even when the state court did not provide reasons for its decision, so long as the state court adjudicated the claim on the merits. *Harrington*, 131 S. Ct. at 784, 785. In the absence of reasons or a written opinion, "a habeas court must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior [Supreme Court] decision . . . ." *Id.* at 786.

### III.
### Analysis

As a preliminary matter we review Langley's application for timeliness, procedural default, and exhaustion of state court remedies. If we find that the claim is procedurally viable, we then look to its merits under the general standards set forth in Section II.C.

*A. Timeliness*

Here Langley sought review on direct appeal from his third trial all the way to the United States Supreme Court, which denied his petition for a writ of certiorari on October 1, 2012. Langley's conviction thus became final on that date. Because he did not seek collateral review at the state level, the relevant dates are only when his conviction became final by denial of review at the Supreme Court and when he filed the instant application on September 30, 2013. A total of 364 days elapsed between these events. Accordingly, Langley's application is timely.

### B. Exhaustion of State Court Remedies and Procedural Default

Finding that the application was timely, we next apply the doctrines of exhaustion of state court remedies and procedural default in order to determine whether we can proceed to the merits of the claim. Upon our review of the appellate record from Langley's third trial, we find that he properly sought review at every level of the state court on his direct appeal. He has therefore exhausted his state court remedies. In addressing the merits of the claim now renewed in his federal habeas petition, the Louisiana Third Circuit Court of Appeal noted no procedural defects and denied the claim on the merits. Therefore we find no grounds for procedural default.

### C. Substantive Analysis

Having determined that the petition can be considered on the merits by this court under § 2254, we will first determine the standard of review to be applied and then look to the merits of the argument.

#### 1. Standard of Review

The sole claim presented here is Langley's contention that his conviction of second degree murder violated the constitutional prohibition on double jeopardy. Such claims are questions of law. *See United States v. Cluck*, 87 F.3d 138, 140 (5th Cir. 1996) (per curiam). We therefore review this claim for contrariness to or unreasonable application of federal law.

#### 2. Merits

The Double Jeopardy Clause of the Fifth Amendment, made applicable to the states through the Fourteenth Amendment, provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb. U.S. CONST. amends. V, XIV. "[T]he Double Jeopardy Clause protects against three distinct abuses: a second prosecution for the same offense after

acquittal; a second prosecution for the same offense after conviction; and multiple punishments for the same offense." *United States v. Halper*, 109 S.Ct. 1892, 1897 (1989).

The alleged double jeopardy violation here centers on the first abuse. Langley claims that his conviction of second degree murder instead of first degree murder in the second trial was a rejection of the element of specific intent. [4] Therefore being charged with second degree murder in the third trial, under a theory of specific intent, had the effect of a second prosecution for the same offense after acquittal.

The Supreme Court has recognized this application of the Double Jeopardy Clause as a component of collateral estoppel, the principle barring relitigation between parties of issues determined at a previous trial. *Ashe v. Swenson*, 90 S.Ct. 1189, 1194–95 (1970). In order to prevail, a petitioner must prove which facts were "necessarily decided" in the first trial. *United States v. Brackett*, 113 F.3d 1396, 1398 (5th Cir. 1997). He must also show that those facts were an essential element of the offense charged in the subsequent trial. *Id.* at 1399. To demonstrate a double jeopardy violation here, Langley must therefore prove that the issue of specific intent to kill Guillory was necessarily decided by the verdict in his second trial. He must then show that specific intent was an essential element of the second degree murder charge under which he was convicted in the third trial.

Whether a fact was necessarily determined in the previous trial is "the touchstone of collateral estoppel doctrine." *Id.* at 1398. This test is especially tricky in criminal cases, where a general verdict does not enumerate which facts were decided by the jury. *Id.* at 1398–99. We thus look to the indictment, testimony, jury instructions, and verdict. *Id.* at 1399. Through our

---

[4] Under the Louisiana Code of Criminal Procedure, conviction of a lesser degree of the offense charged is deemed an acquittal of the greater offense. LA. CODE CRIM. P. art. 598(A). We therefore treat the verdict in the second trial as an acquittal of first degree murder. *See Langley*, 958 So.2d at 1170.

examination we seek to determine "whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." *Ashe*, 90 S.Ct. at 1194.

In this analysis we may not consider "mistake, compromise, or lenity" on the party of the jury. *United States v. Powell*, 105 S.Ct. 471, 476–77 (1984); *see also Neal v. Cain*, 141 F.3d 207, 211 (5th Cir. 1998). However, the Fifth Circuit recognizes that reconciling inconsistent verdicts "is best approached on a case by case basis, and that our approach should be based on realism and rationality." *United States v. Price*, 750 F.2d 363, 366 (5th Cir. 1985). As the Supreme Court has held, "[t]he inquiry 'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.'" *Ashe*, 90 S.Ct. at 1194 (quoting *Sealfon v. United States*, 68 S.Ct. 237, 240 (1948)).

Langley contends that no rational jury could have grounded his acquittal of first degree murder in the second trial on any issue other than specific intent. He rests this argument in the notion that the jury must have concluded that the victim was under twelve years old. Therefore, in order to have acquitted Langley of first degree murder, it must have failed to find that he acted with specific intent to kill. However, Langley urges us to look too narrowly. After reviewing the testimony and the verdict in its entirety, we cannot agree that this issue was determined.

After choking Guillory, Langley strangled him and then forced a sock down his mouth and well into his throat. He confessed to this manner of killing on at least four separate occasions, three of which were played for the jury at trial and corroborated by the physical evidence. Additionally, the jury was specifically instructed that intent could be inferred from the circumstances and that individuals were presumed to intend the natural consequences of their actions. "Sturdier threads are needed," therefore, to support a finding that a rational jury would not find that Langley acted with specific intent to kill. *United States v. Dray*, 901 F.2d 1132, 1140 (1st Cir. 1990).

The defense based its refutation of specific intent squarely and solely within Langley's alleged insanity. It contended that he could not have intended to kill Guillory because his mental illness prevented him from distinguishing right from wrong. However, the jury failed to find Langley not guilty by reason of insanity. Under the insanity instruction used at trial, then, the jury must have failed to find that Langley was incapable of distinguishing right from wrong. Therefore it could not have used this same element to find that he lacked specific intent.

We can locate no other grounds within the record of the second trial to support a finding of no specific intent. Accordingly we find that the issue was not necessarily determined in Langley's favor during the second trial. It could thus be considered in subsequent proceedings, as it was at Langley's third trial, even if it was an essential element of the offense charged there. *See Brackett*, 113 F.3d at 1399. This claim therefore offers no basis for federal habeas relief.

## IV.
### CONCLUSION

Accordingly, **IT IS RECOMMENDED** that the instant application be **DENIED** and **DISMISSED WITH PREJUDICE**.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days from receipt of this Report and Recommendation to file any objections with the Clerk of Court. Timely objections will be considered by the district judge prior to a final ruling.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of its service shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1429–30 (5th Cir. 1996).

In accordance with Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue. *See* 28 U.S.C. § 2253(c)(2). A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.

THUS DONE this 14th day of December, 2015.

_____
KATHLEEN KAY
UNITED STATES MAGISTRATE JUDGE